Eli Gottesdiener (EG 0111)
GOTTESDIENER LAW FIRM, PLLC
498 7th Street
Brooklyn, NY 11215
Telephone: (718) 788-1500
Facsimile:  (718) 788-1650

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
JONATHAN X. FLAGG and                          :
                                               :
JACQUELINE ALVAREZ,                            :
                                               :
On behalf of themselves and on                 :
behalf of all others similarly situated,       :
                                               : 07 Civ. 7392 (PKC) (HBP)
                        Plaintiffs,            :
                                               :
             - against -                        :
                                               :
SKADDEN, ARPS, SLATE, MEAGHER                  :
& FLOM PENSION PLAN,                           :
                                               :
                        Defendant.            :
--------------------------------------------------------x

## PLAINTIFFS' OPPOSITION
## TO DEFENDANT'S PARTIAL MOTION TO DISMISS

## TABLE OF CONTENTS

Table of Authorities ................................................................................................................. ii

Introduction .........................................................................................................................1

Statement of Facts ...............................................................................................................7

Argument ...........................................................................................................................14

I.     Ms. Alvarez did not have actual knowledge in 1998 that
       she had been underpaid ...........................................................................................14

II.    The discovery rule, not the injury occurrence rule, is the governing
       test as to when Ms. Alvarez's claim accrued.  Under that test, her
       claim is not time-barred because she had no reason to suspect at the time
       she was underpaid that in fact she had been underpaid. ......................................16

III.   Even if her claim accrued, Ms. Alvarez's action is nevertheless timely ..........................21

       A.     The elements of equitable estoppel are satisfied here...........................................22

       B.     The elements of equitable tolling are satisfied here...............................................24

Conclusion .........................................................................................................................26

TABLE OF AUTHORITIES

FEDERAL CASES

*Airco Alloys Div., Airco Inc. v. Niagra Mohawk Power Corp.,*
   430 N.Y.S.2d 179 (1980) .......................................................................................25

*Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2003) ...........................................3

*Berger v. Xerox Corp. Ret. Income Guar. Plan*, 338 F.3d 755 (7th Cir. 2003)...........................2

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990) ...........................................17, 24

*Candelaria v. Erickson*, 2005 WL 1529566 (S.D.N.Y., June 28, 2005) ........................................25

*Carey v. IBEW Local 363 Pension Plan,* 201 F.3d 44 (2d Cir. 1999).................................5, 17, 23

*Central States v. Groesbeck Lumber & Supply, Inc.,*
   2000 WL 1670956 (N.D. Ill. 2000) ....................................................................19

*Cerbone v. Int'l Ladies Garment Workers' Union,* 768 F.2d 45 (2d Cir. 1985) ..........................26

*Chardon v. Soto,* 462 U.S. 650 (1983).......................................................................24

*Connors v. Hallmark & Sun Coal Co.,* 935 F.2d 336 (D.C. Cir. 1991)......................................17

*Corcoran v. New York Power Auth.,* 202 F.3d 544 (2d Cir. 1999) ...........................................16

*Cotter v. Eastern Conf. of Teamsters Retirement Plan,*
   898 F.2d 424 (4th Cir. 1990) .......................................................................17, 18

*Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995)……………………………………….7

*Devito v. Pension Plan of Local 819 I.B.T. Pension Fund,*
   975 F. Supp. 258 (S.D.N.Y. 1997) ...................................................................18

*Ely-Cruikshank Co. v. Bank of Montreal,* 81 N.Y.2d 399, 599 N.Y.S.2d 501,
   615 N.E.2d 985 (1993) ................................................................................4

*Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir. 2000)........................................... passim

*Esden v. The Retirement Plan of First National Bank of Boston,*
   182 F.R.D. 432, (D. Vt. 1998),
   *rev'd on other grounds,* 229 F.3d 154 (2d Cir. 2000) ..................................................18, 21

ii

*Fink v. Nat'l Savings and Trust Co.,* 772 F.2d 951, (D.C. Cir.1985)............................................20

*Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989)......................................................22

*Guilbert v. Gardner,* 480 F.3d 140 (2d Cir. 2007) ............................................................5, 16, 17

*Hebert v. AAI UIC Retirement Plan,* 2006 WL 1996855 (D. Md.) ...............................................19

*Keating v. Carey,* 706 F.2d 377 (2d Cir. 1983) ............................................................................24

*Kiefer v. Ceridian Corp.,* 976 F.Supp. 829 (D.Minn.1997)..........................................................18

*Kronisch v. United States,* 150 F.3d 112 (2d Cir. 1998)...............................................................16

*La Barbera v. R. Rio Trucking*, 03-CV-1508 (SLT)(AKT),
2007 WL 2177063 (E.D.N.Y. July 27, 2007)...................................................................5

*Laurent v. PricewaterhouseCoopers LLP*, 448 F.Supp.2d 537 (S.D.N.Y. 2006).................. passim

*Laurenzano v. Blue Cross and Blue Shield of Mass.,*
134 F.Supp.2d 189 (D. Mass. 2001) ..............................................................................20

*Lyons v. Georgia-Pacific Corp.*, 221 F.3d 1235 (11th Cir. 2000).....................................................3

*McDonald v Pension Plan of the NYSA-ILA Pension Trust Fund*,
153 F. Supp.2d 268 (S.D.N.Y. 2001)...............................................................................3

*Miele v. Pension Plan of New York State Teamsters Conf. Pension and Ret. Fund*,
72 F. Supp. 2d 88 (E.D.N.Y. 1999) ...............................................................................18

*Miles v. N.Y.S. Team. Conf. Pension and Ret. Fund Employee Pens. Benefit Plan*,
698 F.2d 593 (2d Cir. 1983) .......................................................................................3, 21

*Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516 (3d Cir. 2007) .....................................................19

*Niagara Mohawk Power Corp. v. Freed*,
696 N.Y.S.2d 600 (N.Y. App. Div. 1999) .......................................................................24

*Novella v. Westchester County, New York Carpenters' Pension Fund*,
443 F.Supp.2d 540 (S.D.N.Y. 2006).................................................................................18

*Rotella v. Wood,* 528 U.S. 549 (2000) ......................................................................................5, 18

*Shoshone Indian Tribe of Wind River Reservation v. U.S.,*
364 F.3d 1339 (Fed. Cir. 2005)........................................................................................22

iii

*State of New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065 (2d Cir. 1988)..............................26

*Stolarz v. Rosen*, 2005 WL 2124545 (S.D.N.Y. Aug. 25, 2006)..................................16

*Syed v. Hercules, Inc.*, 214 F.3d 155 (3d Cir. 2000).......................................................7

*Thompson v. Metropolitan Life Ins. Co.,* 149 F.Supp.2d 38 (S.D.N.Y. 2001) ..............................16

*Varity Corp. v. Howe,* 516 U.S. 489 (1996) ................................................................21

FEDERAL STATUTES AND REGULATIONS

Employee Retirement Income Security Act of 1974 (ERISA)

§ 203(a), 29 U.S.C. § 1053(a) ........................................................................2

§ 205, 29 U.S.C. § 1055................................................................................3

§ 205(g)(3), 29 U.S.C. § 1055(g)(3) ...............................................................2

§§ 301-413, 29 U.S.C. §§1101-1113 ...............................................................3

§ 502, 29 U.S.C. § 1132................................................................................3


Internal Revenue Code (IRC)

26 U.S.C. ("IRC") § 401(a)(4)........................................................................7

IRC § 417(e) ...............................................................................................2


Treasury Regulations

26 C.F.R. ("Treas. Reg.") § 1.401(a)(4)-12 ......................................................2

Treas. Reg. § 1.417(e)-1(d)............................................................................2

"Nondiscrimination Requirements for Qualified Plans,"
56 Fed.Reg. 47524(1991) ......................................................................13

IRS Notices

IRS Notice 96-8, 1996-1 C.B. 359-61, 1996 WL 17901 (Feb. 5, 1996) ........................ 7-8

Federal Rules of Civil Procedure

Fed. R. Civ. P. 8...........................................................................................1


Other Authorities

Bogert, *The Law Of Trusts And Trustees* § 951 (2007) ......................................22

## Introduction

Defendant's partial motion to dismiss focuses mostly on trying to defeat a claim neither plaintiff makes:  one for "ongoing omissions."  Def. Mem. at 1-15.  Plaintiffs <u>do</u> contend that the Skadden, Arps, Slate, Meagher, & Flom LLP Pension Plan ("Skadden" or the "Plan") and the Skadden firm's partners who via committee served as Plan administrator, *see* Doc. 13, First Amended Complaint ("FAC") ¶ 7, made material misstatements and omissions to them and their fellow Plan participants about the Plan and Plan benefits.  But Plaintiffs make no claim**,** *see* Fed. R. Civ. P. 8, for which they seek relief on that basis.[1]  Establishing that the Skadden Plan, through the Plan administrator or its sponsor, Skadden, Arps, Slate, Meagher, & Flom LLP (also sometimes referred to here as "Skadden" or the "Firm"), indeed misspoke or failed to speak when it had the duty to do so is also not an element of the sole claim for relief that Plaintiffs assert. Plaintiffs' claim is direct and straightforward – they seek to be paid what they are owed and have been owed ever since the Plan illegally computed the lump sum pension benefits they elected to receive after terminating employment with Skadden. Plaintiffs want the Plan to make up the difference between what it paid them and should have paid them, with interest.

Skadden does not dispute that the Plan's lump sum provisions are illegal.  ERISA and the Internal Revenue Code (the "Code") require that lump sum distributions (and other optional forms of distribution) from defined benefit pension plans be no less than the actuarial equivalent of the normal retirement benefit, *i.e.*, the annuity under the terms of the plan payable at normal retirement age (typically, and here, age 65).  At least through August 17, 2006 (when Congress enacted certain changes to the law not currently at issue here), for a defined benefit plan of the "cash balance" variety (like the Skadden Plan), this requires what is known as a "whipsaw"

---

[1] Neither the original Complaint (Doc. 1) nor the First Amended Complaint contains either the word "ongoing" or the word "omission."  A Westlaw search of All Federal cases looking for cases with the phrase "ongoing omissions" yielded no results.

calculation: the Plan must project forward to normal retirement age the notational cash balance account of any participant departing the Plan prior to age 65 at the plan's interest crediting rate, convert the account balance to an annuity, then discount the value of those annuity payments to their present value using the statutorily-prescribed interest rate (either the 30 year Treasury bond or in earlier years a set of Pension Benefit Guaranty Corporation rates). When the required projection rate is greater than the statutorily-prescribed discount rate -- as it was throughout the relevant period here (January 1, 1992 to August 17, 2006), FAC ¶ 14 -- the actuarial equivalent of the normal retirement benefit, *i.e.,* what the participant is actually owed, will be more than the notational account balance. However, by its terms and as a matter of consistent practice, the Plan invariably paid lump sums equal to participants' account balance. *Id.* ¶¶ 13-16, 31.[2]

Every Circuit Court of Appeals to consider the issue, including the Second Circuit, has held that unless this higher amount is paid out, an impermissible forfeiture has occurred in violation of ERISA § 203(a), 29 U.S.C. § 1053(a). *Esden v. Bank of Boston,* 229 F.3d 154 (2d Cir. 2000); *Berger v. Xerox Corp. Ret. Income Guarantee Plan,* 338 F.3d 755 (7th Cir. 2003); *West v. AK Steel Corp..* 484 F.3d 395 (6th Cir. 2007); *Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan*, 221 F.3d 1235 (11th Cir. 2000). Those courts also concluded that the failure to pay the higher lump sum results in a violation of the requirement that lump sums be no less than the actuarial equivalent of the normal retirement annuity found in ERISA § 205, 29 U.S.C. § 1055.[3]

---

[2] By its terms, the Plan forfeits plan participants' accrued benefits by calculating lump sum distributions of participants' benefit before normal retirement age as if they are always equal the current, stated value of their notional account balance, even when the actuarial equivalent of their normal retirement benefit exceeds their account balance. *Id.* Thus, the Plan did not violate the terms of the Plan document in calculating participants' benefit; rather, the terms of the Plan violate ERISA.

[3] *Accord Laurent v. PricewaterhouseCoopers,* 448 F.Supp.2d 537, 541-49 (S.D.N.Y. 2006) (Mukasey, C.J.) (striking down sponsor's sophisticated attempted evasions of the whipsaw rule).

The only issue for the Court to decide at this time is whether the Plan can keep the money that rightfully belongs to former Skadden employees like Plaintiff Jacqueline Alvarez who received incomplete distributions of their statutorily protected Plan benefit more than 6 years prior to the date this action was filed because, Skadden argues, the claims of such participants accrued, and the applicable limitations period expired, more than 6 years prior to August 20, 2007, the date this action commenced.[4]

Although Skadden bears the burden of proof as to the affirmative defense of limitations it presents, *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2003), Skadden devotes only three pages of its 19 page submission to arguing that Ms. Alvarez's claim for benefits underpaid accrued and the limitations clock started in 1998 when she received the underpayment or at least no later than August 20, 2001, 6 years prior to the commencement of this action. Def. Mem. at 17-19.[5]

Defendant's three-page presentation contains two arguments – one frivolous, the other wrong.

Defendant starts with the frivolous argument:  it contends that Ms. Alvarez actually *confesses* in the Complaint that she knew all about the alleged underpayment when it was made

---

[4] The parties agree that the limitations period for a state law breach of contract claim is the appropriate one to apply to non-fiduciary claims for relief under ERISA § 502, 29 U.S.C. § 1132 such as Plaintiffs assert here, given ERISA's silence on the issue. *See Miles v. N.Y.S. Team. Conf. Pension and Ret. Fund Employee Pens. Benefit Plan*, 698 F.2d 593, 598 (2d Cir. 1983).  This is true whether the claim is based directly on the actual written terms of the plan (as in a garden-variety benefit claim) or, as here, the terms of the plan read in light of the statute's mandatory requirements. *E.g., McDonald v Pension Plan of the NYSA-ILA Pension Trust Fund*, 153 F. Supp.2d 268, 292 (S.D.N.Y. 2001) (applying 6 year New York contract claim limitations period in case asserting a statutory benefit claim).

[5] The section of Defendant's brief arguing Ms. Alvarez's claim is time-barred begins at the bottom of page 15 but pages 15 and 16 contain no affirmative argument that Ms. Alvarez's claim is time-barred.  The bottom of page 15 makes the point that a court can decide that a claim is time-barred on a motion to dismiss while page 16 makes the point that the applicable limitations period is 6 years and federal rather than state law governs when Ms. Alravez's claim accrued. *Id.* at 16.

but for some reason decided not to do anything about it for 9 years.  Def. Mem. at 17.  The

contention is easily disproven.  (*See* Argument, Section I, below).

Second, Defendant argues, in essence, that the standard the Court must apply here is a

"date of injury" or "injury occurrence" rule of claim accrual.  Under this rule, an ERISA

claimant's benefit claim accrues for limitations purposes as soon as the claimant is injured – here,

through receipt of an underpaid pension benefit – even if the claimant was reasonably and

blamelessly ignorant of the fact that she had been injured.

If state law governed the question of when the claim here accrued, Skadden might have a

point.  *See, e.g., Ely-Cruikshank Co. v. Bank of Montreal,* 599 N.Y.S.2d 501, 502 (1993) (a cause

of action for breach of contract ordinarily accrues and the limitations period begins to run upon

breach even if plaintiff is unaware of the breach).  But federal law determines when Ms.

Alvarez's claim accrued, and as the Second Circuit only recently noted, "[a] federal court

generally employs the 'discovery rule,' under which 'a plaintiff's cause of action accrues when he

discovers, or with due diligence ***should*** have discovered, the injury that is the basis of the

litigation.'  *Guilbert v. Gardner,* 480 F.3d 140, 149 (2d Cir. 2007) (citation omitted) (emphasis

added) (citing among other authorities *Carey v. IBEW Local 363 Pension Plan,* 201 F.3d 44 (2d

Cir. 1999)).  *Accord Rotella v. Wood,* 528 U.S. 549, 555 (2000) (referring to the "traditional

federal accrual rule of injury discovery").

*Guilbert* makes exactly the distinction Skadden misses:  that the federal "diligence-

discovery rule of accrual" applies to ERISA benefit claims, whereas an injury occurrence accrual

rule applies to parallel state law claims, which in *Guilbert* were the only ones the plaintiff had left

once the courts had ruled he failed to state an ERISA claim.[6]

---

[6] *Accord La Barbera v. R. Rio Trucking*, 03-CV-1508 (SLT)(AKT), 2007 WL 2177063, at *3 (E.D.N.Y.
July 27, 2007) (following *Guilbert* and denying employer's motion to find ERISA delinquent contribution

Skadden does not cite *Guilbert*. And while it does cite *Carey*, by the time Skadden is finished with it *Carey* has been transformed (from a case reaffirming the necessity of testing a defendant's accrual argument against the discovery rule into a case authorizing application of the automatic, accrual-upon-injury rule that Skadden needs to have applied in order for its motion to succeed.

Skadden has no backup to its injury occurrence argument – meaning, it makes no **discovery rule** argument that in the exercise of reasonable diligence Ms. Alvarez should have discovered in 1998 when the Plan underpaid her that she in fact had been underpaid. That is because no such argument <u>can</u> be made: the Plan paid Ms. Alvarez exactly what the Plan had always told her, through the Plan's summary plan description ("SPD"), it was the most she could ever expect to receive, *i.e.,* the then-current value of her notional account balance. FAC ¶¶ 16-17; 1997 SPD at 4, 13 (Doc. 18-6, Ex. D to Brown Decl.); 1992 SPD at 2, 13 (Doc. 18-5, Ex. C to Brown Decl.) ("It's easy to understand, operating like a bank account . . . . It's portable so that if you leave the Firm . . . you have the option of taking your benefit with you as a lump sum . . . .A lump sum payment is a one-time distribution equal to the value of our account balance on your benefit commencement date. Once this distribution is made, no further distributions are payable").

The problem is, this was and is completely false as a matter of law. *See Esden,* 229 F.3d at 159-173; *Laurent v. PwC,* 448 F.Supp.2d at 543-44, 547-49 ("for a cash balance plan, the accrued benefit is not the hypothetical account balance, but rather an amount derived from such hypothetical accounts that expresses an annuity with payments commencing at normal retirement

---

action time-barred after rejecting employer's argument that the fund's claims accrued when the breach occurred as opposed to when it was or should have been discovered) (collecting cases).

age"; "[w]hen determining the amount owed to an employee whose pension plan has vested but who has not reached normal retirement age, a whipsaw calculation must be performed").

ERISA does not place the burden on participants to figure out for themselves whether the representations made to them by the plan, the plan's sponsor (their employer), or the plan's fiduciaries are consistent with the statute, particularly in matters as complicated as actuarially equivalent distributions issuing from a defined benefit pension plan. Skadden wants to blame the victim for a problem entirely of its own making.

But Defendant's automatic accrual-upon-payment rule more than misstates the statute of limitations law. It is overkill: the discovery rule is robust enough to weed out truly stale claims, such as claims for underpayment brought by plaintiffs where their injury was literally staring them in the face for years (with each underpayment they received, for instance), or where the accuracy of a one-time pay-out could and *should* have been checked with a bit of simple math but wasn't for years. No matter how sympathetic the plaintiff, or how subjectively unaware to his injury he may have been, the discovery rule says "too bad": in a world of human error, even a participant entitled to trust his fiduciary has to exercise reasonable diligence to ensure a mistake has not been made. In a case like that the discovery rule reaches the same outcome Defendant's accrual-upon-payment rule does, so what rule is being applied doesn't matter.

But that's not this case. In this case everything added up: to apply an accrual-upon-payment rule in a case like this where the injury is entirely hidden is harsh and unfair to the reasonably and blamelessly ignorant participant who was not told when paid that she was being **denied** anything and who had affirmatively been led to believe that there was one and only one correct way of calculating her pension payout. Defendant's rule thus is bad policy too: it would *reward* employers who make minimal and even misleading disclosures about the operation of their plans. It would also force participants, especially in states with very short limitations

6

periods like Minnesota or Delaware (which have 2 and 1 year limitations periods respectively, *see Syed v. Hercules, Inc.*, 214 F.3d 155, 161 (3d Cir. 2000)), to hire attorneys or actuaries (or even head straight to court) upon receipt of a pay-out to determine whether some provision of their plan under which their benefits were calculated might run afoul of ERISA. Otherwise, their right to challenge the accuracy of their pay-out would be lost forever. "Congress could not have intended such a result." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 81 (1995).[7]

### Statement of Facts

1.      The defined benefit pension plan at issue in this case is what is known as a "cash balance" pension plan. It resembles a 401(k) defined contribution plan in that the benefits payable under the Plan are calculated based on the value of a hypothetical "account" established under the Plan on behalf of each participant. As in the typical cash balance plan, under the terms of the Plan a participant simultaneously accrues two different but related benefits for each period of service with the Company: (1) a pay (or "service") credit based on the participant's compensation during the period *plus* (2) the right to receive future interest credits on those pay credits, at the rate provided for by the Plan, through normal retirement age (age 65 under the Plan). FAC ¶¶ 9-11.

2.      In technical terms, the Plan was, as a result, a "frontloaded" interest crediting plan, meaning interest credits under the Plan are part of the participant's "accrued benefit" and are guaranteed all the way through age 65 whether the participant leaves her benefit in the plan or not. *Id.* ¶ 11. *See* Ex. 1, IRS Notice 96-8, 1996-1 C.B. 359-61, 1996 WL 17901 (Feb. 5, 1996).[8]

3.      The interest rate provided for under the Skadden Plan, since its adoption of a cash

---

[7] In Part III, Ms. Alvarez shows that even assuming her claim accrued more than 6 years prior to the initiation of this action, it is still timely because the elements of equitable tolling and/or equitable estoppel are satisfied here.

[8] All exhibits are attached to the Declaration of Eli Gottesdiener ("Decl." or "Gottesdiener Decl."), filed simultaneously herewith.

balance formula in 1992, is equal to the yield on 1-year Treasury Constant Maturities plus 1%, with a guaranteed minimum of the lesser of (a) 8% and (b) the midpoint of the range established for the "standard interest rate" by regulations issued under Code § 401(a)(4), as such range may be adjusted from time to time by the IRS Commissioner pursuant to such regulations, and maximum interest credit rate of 12%. *Id.* ¶ 10; 1994 Plan § 4.4(b) (Doc. 18-3, Ex. B to Brown Decl.). As explained below, prong (b) of this "lesser-of" guaranteed minimum rate is and always has also been 8%, making the guaranteed minimum in practice 8%. *Id.* ¶ 17.

4.   The merits of this action concern Skadden's failure to honor a participant's nonforfeitable right, in being paid a pre-age 65 lump sum distribution of her benefit, to have her account balance valued all the way to age 65 at the Plan's guaranteed minimum interest rate, then converted to an annuity at age 65 using the Plan's annuity conversion factors, before being discounted back down to a present value using the statutorily-required discount (or interest) rate. *Id.* ¶¶ 13-18, 30-32.

5.   The Plan's minimum interest rate guarantee was and is an extremely valuable plan feature. Each year since 1992, as a result of that feature, the interest credits applied to participant accounts have been 8%. *Id.* ¶ 17. The reason for this is that prong (b) of the guarantee – which is fixed yet conceivably variable (being the midpoint of the range established for the standard interest rate in the applicable notice-and-comment Treasury Regulations promulgated in 1991 under Code § 401(a)(4), as may be adjusted by the IRS Commissioner pursuant to those regulations) – is 8% and has always been 8%.[9] *See* 26 C.F.R. ("Treas. Reg.") § 1.401(a)(4)-12 (range is "neither less than 7.5 percent nor greater than 8.5 percent," making the midpoint 8%).

6.   The "neither less than 7.5 percent nor greater than 8.5 percent" range established for the standard interest rate – the midpoint of which establishes prong (b) –is not expected to

---

[9] 8% is the obvious result of taking the lesser of (a) 8% and (b) 8%.

change.  *Id.* ¶¶ 16-18; *accord* Decl. ¶ 3, Ex. 2, 1994-2005 Skadden Plan IRS Form 5500s,

Schedule B attachment (yearly statements by Plan's actuaries that they expect participant account

balances to grow into the foreseeable future by *at least* 8%).

7.     Because 8% has consistently been greater than the 1 year Treasury bill plus 1%,

*see* www.irs.gov, it has been the guaranteed minimum interest crediting feature, not the variable

rate index and associated margin (1 year Treasury bond plus 1%), that has actually determined

the amount participants have received credited to their accounts each year since 1992.

8.     Plaintiff Jonathan Flagg worked for the Skadden Firm from 1998 until 2003.  FAC

¶ 8.  Plaintiff Jacqueline Alvarez worked for Skadden from 1988 to 1997.  *Id.*  During that time,

Plaintiffs accrued pension benefits under the Plan.  *Id.*  ¶ 9.

9.     After terminating employment, Plaintiffs elected to receive their fully-vested Plan

benefits in the form of a lump sum distribution.  *Id.*  ¶ 12.  Plaintiff Flagg received a distribution

in 2004.  He was age 34 at the time.  Plaintiff Alvarez received a distribution in 1998.  She was

age 34 at the time.  *Id.*

10.     The IRS specifically admonished plans like the Skadden Plan having variable

interest rates to specifically "prescribe" an objectively determinable "method for reflecting future

interest credits in the calculation of an employee's accrued benefit" that truly reflected "the value

of those credits."  IRS Notice 96-8, Section III.B.1.  The Skadden Plan, however, fails to

prescribe any such methodology or acknowledge its obligation to project participants' account

balances to normal retirement age at a rate that did not understate the value of the interest credits

they had previously earned.  FAC ¶ 13.[10]  It thus calculated and paid Plaintiffs a benefit

---

[10] The Plan's consistently prevailing 8% interest rate has throughout the relevant time been considerably
higher than the then-prevailing interest rate Congress directed be used in reducing participants' normal
retirement benefits to a lump sum present value.  *See* 30 year Treasury rates at, among other places,
www.irs.gov, and the applicable PBGC rates, at www.pbgc.gov.
.

according to the terms of the Plan that was not the actuarial equivalent of the amount they would have received had they left their benefit in the Plan until age 65.  *Id.* ¶¶ 13-15, 31.

11.    Had the Plan performed the required "whipsaw" calculation by projecting Plaintiff's hypothetical account balance to normal retirement age at a rate that did not understate the value of the interest credits they had previously earned, Plaintiffs' benefits expressed in the form of a lump sum would have exceeded the lump sum amount that they received.  *Id.*

12.    The Plan never informed participants that they were or may under certain circumstances be entitled to more than their then-current account balance in the event they requested a lump sum distribution before normal retirement age.  *Id.*  ¶¶ 15-16.  Instead, what Skadden told participants was:

> The Plan is a defined benefit plan which is a "cash balance plan."  For all active participants, a bookkeeping account is established with a beginning balance of $0.  For each Year of Service you complete, your account grows with Interest Credits and Service Credits, as described on page 8.
>
> The Plan has been designed to meet your specific needs:
>
> •    It's an important source of income for your financial security at retirement.
>
> •    It's easy to understand, **operating like a bank account** with your benefit expressed in dollars and cents.
>
> •    It provides a meaningful benefit to employees of all ages.
>
> •    It's portable so that if you leave the Firm with at least five (5) years of Service, you have the option of taking your benefit with you as a lump sum.

Regarding "Payment of Benefits," Skadden explained the payment they should expect to receive if they elected the lump sum optional form of benefit:

> A lump sum payment is a one-time distribution **equal to the value of your account balance on your benefit commencement date.**[11]  Once this distribution is made, no further distributions are payable.

---

[11] "Benefit Commencement Date" is elsewhere defined as "the date as of which your benefit will be paid." 1997 SPD at 15.

Additionally, the SPD explains what a participant should expect in the event her application for benefits is denied in whole or in part:

> If your application for benefits is denied in whole **or in part**, the Plan Administrator will notify you or your authorized representative within 90 days of receiving your application. . . . .If you are denied a claim for benefits, you will receive in writing: (i) an explanation of the specific reason(s) for the denial (ii) specific references to pertinent Plan provisions on which the denial is based (iii) a description of any additional material or information necessary for you to establish properly the claim and an explanation of why such material or information is necessary (iv) an explanation of the steps you or your beneficiary can take to submit the claim for review . . . .

1997 SPD at 4, 13, 21 (emphases added); *see also* 1992 SPD at 2, 13, 21 (same).

13.     When Ms. Alvarez applied for her benefit, she received a lump sum distribution of her Plan benefit in an amount equal to the stated amount of her notional account balance as of her benefit commencement date.  FAC ¶¶ 13-16, 31.  The Plan forwarded her a check equal to that amount (minus applicable taxes) but did not tell her that her application had been denied in part (in that her benefit was calculated by excluding the right she had earned to receive interest credits on her account balance all the way to age 65).  *Id.* ¶ 15.  Instead, the Plan said this:

> Dear Ms. Alvarez:
>
> On behalf of the Skadden, Arps, Slate, Meagher & Flom Pension Plan (the "Plan" Committee and pursuant to the terms of the Plan, I am pleased to enclose a check in the amount of $7,961.92 ($9,952.40 less Federal income tax withholding of $1,990.48) **representing the full value of your vested interest (100%) in the Plan.**
>
> Please read carefully, [sic] the enclosed Exhibit A, which explains the Federal Tax Treatment of Distributions from Qualified plans.  You also should consult your personal tax advisor regarding this matter.
>
> Please sign and return the enclosed copy of this letter in the enclosed self-addressed stamped envelope which will evidence your receipt and acceptance, without objection, of the enclosed check as **full settlement of your rights under the Pension Plan.**
>
> If you should have any questions regarding this matter, feel free to call me [etc].

11

Decl. ¶ 4, Ex. 3 (emphases added).

14.     According, Ms. Alvarez was not informed that her benefit was calculated by excluding the right she had earned to receive interest credits on her account balance all the way to age 65, that she had been denied a benefit in whole or in part, or that there was any other recognized methodology for calculating her benefit.  FAC ¶¶ 15-16.

15.     Many cash balance plans lawfully make, and throughout the relevant time lawfully made, lump sum distributions to departing pre-age 65 participants in an amount equal to their account balance.  *See* IRS Notice 96-8, Section III.B.2, 3.  Such a distribution is permissible, for example, when the plan employs a crediting rate such as Skadden implied to participants that the Plan used – *i.e.,* a rate equal to the yield on a 1-year Treasury bond plus 1% with either no guarantee or a low guaranteed minimum not higher than the applicable, statutory discount rate. *Id.* & *id.,* Section IV (setting forth proposed "safe harbor" crediting rates).  Such a rate would mean that the plan would be exempted under IRS Notice 96-8's "safe harbor" tables from having to perform any whipsaw calculation (and in all likelihood exempt pursuant to Notice 96-8, Section III.B).  *Id.*

16.     Although the rate at which participants' account balances are credited with interest is one of the two key determinants of their benefit; although the rate under the Skadden Plan comes with a guarantee minimum (or "floor"); and although that floor is and has consistently been very high (8%), Skadden has never once disclosed to participants anything about this Plan feature.  FAC ¶¶ 16-18; 1992, 1997 SPDs (Brown Decl., Exs. C-D); 2003-2006 SPDs (Gottesdiener Decl. ¶ 5, Exs. 4-7).

17.     Skadden never disclosed to participants the nature or content of the minimum interest rate feature; that participants are guaranteed to receive the lesser of (a) 8% per annum and (b) the midpoint of the range established for the "standard interest rate" by regulations issued

under Code § 401(a)(4); and that the rate participants have seen applied to their accounts each year since 1992 (8%) is the result of the Plan's guaranteed minimum interest crediting. *Id.*

18.     The Plan's SPDs not only fail to disclose the nature or content of the minimum interest guarantee, but the SPDs issued following the Second Circuit's 2000 decision in *Esden* remove any reference to the existence of a guaranteed minimum at all. *See* Gottesdiener Decl., Exs. 4-7. In addition, they move all discussion of the interest crediting rate to an appendix. *Id.*

19.     Both of the pre-*Esden* SPDs – the 1997 and 1992 SPDs – that mention the guaranteed minimum interest bury the existence of the guarantee at the end of a long, densely-worded footnote which consists chiefly of a detailed description of exactly how the 1-year Treasury bond aspect of the interest crediting rate is determined down to the "nearest 1/100[th] of a percentage point" (even though the 1 year Treasury bond aspect of the Plan's crediting rate has never actually been the rate applied to participant accounts). Thus, the Plan says this under "Interest Credits":

> In addition to the Firm's annual "service credits," your account will be credited with interest each December 31 (an "interest credit"[1]). The applicable interest rate will be determined and announced at the beginning of each Plan Year. The "interest credit" rate for the 1997 Plan Year is 8%.

Footnote 1 (Footnote * in the 1992 SPD) reads:

> The interest credit rate for a given Plan Year is equal to the average interest rate of one-year Treasury Constant Maturities as published in the *Federal Reserve Statistical Release* H.15(519) of the Board of Governors of the Federal Reserve System, measured in October 1, November 1 and December 1 of the year immediately preceding the Plan Year, plus one (1) percentage point. The average interest rate shall be calculated and rounded to the nearest 1/100[th] of a percentage point. This will not be more than 12%, **nor less than a rate *calculated according to a formula specified in the Plan*.**

1997 SPD at 8 & n.1 (emphasis added); *see also* 1992 SPD at 7 & n.* (same, but states 1992 Plan Year instead of 1997 Plan Year).

20.     Plaintiffs allege that the reason why Skadden chose to communicate as it did with

13

participants regarding the Plan's crediting rate is because it knew that with such a high guaranteed minimum rate, the Plan was not using a "safe harbor" rate, but instead a rate that legally obligated it to pay whipsaw. *Id.* ¶¶ 15-18. Skadden did not intend to pay what it knew it owed participants and wanted to conceal that fact from them to induce inaction on their part in attempting to recover the full benefits they were owed. *Id.* ¶¶ 15-18, 22.

21. Even prior to the Plan's adoption of a cash balance formula in 1992, the IRS put Skadden on notice that the manner in which Skadden intended to calculate lump sums was illegal. *See* "Nondiscrimination Requirements for Qualified Plans," 56 Fed.Reg. 47524, 47528 (1991). The IRS reaffirmed its position on whipsaw in Notice 96-8, which the Second Circuit sustained in *Esden* in 2000 and numerous other courts and circuits have sustained since. *Laurent v. PricewaterhouseCoopers,* 448 F.Supp.2d at 541-49 (striking down attempted evasions of the whipsaw rule as invalid "loophole[s]"). Nevertheless, Skadden continued to violate the law and continued to conceal from participants that there was an alternative method for calculating lump sums that the Plan declined to follow but which would or could entitle participants to a greater pay-out than merely their current account balance. *Id.* ¶¶ 13-18, 22.

**Argument**

## I.    Ms. Alvarez did not have actual knowledge in 1998 that she had been underpaid.

Skadden argues that Ms. Alvarez's claim accrued in 1998 upon receipt of the challenged underpayment because Ms. Alvarez "explicitly alleges" that she knew all about the Plan's illegal lump sum provisions and practices by that time. Def. Mem. at 17. Citing to FAC ¶ 21, Skadden says Ms. Alvarez there alleges "that [she] did not seek an **immediate** administrative review of her lump sum benefit determination in 1998 because **by then** it was **already** clear to her that the Plan administrators would have denied her claim]." Def. Mem. at 17 (emphases added).

14

Everything just highlighted in bold is complete invention on Skadden's part. FAC ¶ 21 says nothing more than that in August 2007, at the time this action was filed, Ms. Alvarez (and Mr. Flagg) knew that asking Skadden outside the judicial process to pay her what she is owed was pointless, not that she knew she had been underpaid and that it would be pointless to ask for what she was owed 10 years ago. *See* FAC ¶ 21 (reproduced below).

FAC ¶ 21 is a paragraph found in the section of the Complaint entitled "Exhaustion of the Plan's Claims Process Was Not Required" which spans paragraphs 19 through 28. In FAC ¶ 19, Plaintiffs explain that they did not exhaust the administrative remedies provided under the terms of the Plan prior to initiating this lawsuit because exhaustion of the Plan's internal claims process was not required and/or should be excused in this case, even assuming the Plan had or has an ERISA-compliant claims process. FAC ¶ 19. They then list four numbered separate reasons (one of which has two distinct parts) for why exhaustion is not required.[12]

In the middle of all this is FAC ¶ 21, where Ms. Alvarez and Mr. Flagg supposedly confess they knew all about the Plan's underpayment practice at the time they received their lumps sums. How this interpretation can be squared with the fact that Plaintiffs explicitly allege that "the Plan concealed from Plaintiffs and the proposed Class the injury that forms the basis for this action," FAC ¶ 16, Skadden never explains. In any event, all FAC ¶ 21 says is:

> Second, even if the exhaustion requirement is not categorically inapplicable here, it should be excused as futile. Had Plaintiffs submitted a claim for the recalculation of their lump sums, Defendant would simply have responded that Plaintiffs had already received

---

[12] In FAC ¶¶ 27-28 Plaintiffs explain that "exhaustion was not required . . .[because] the Plan's internal claims process is not designed to address and is not capable of addressing alleged statutory violations" and "should be excused because it would serve few if any of the recognized purposes of the exhaustion requirement." In FAC ¶ 22 Plaintiffs explain that futility is demonstrated because the legal standard Skadden needed to apply in calculating lump sums was established even before the Plan went into operation and has since been confirmed yet Skadden continues to ignores the law's requirements. In FAC ¶ 20 Plaintiffs explain that exhaustion is as a threshold matter also not required "because the claims Plaintiffs raise are statutory claims involving the interpretation of ERISA, not purely plan-based benefit claims involving an interpretation of the Plan."

an amount equal to their account balance and that is all that they are entitled to receive under Defendant's interpretation of the Plan.

FAC ¶ 21.

It is obviously absurd for Skadden to argue as it does, that in FAC ¶ 21 Ms. Alvarez alleges "that [she] did not seek an **immediate** administrative review of her lump sum benefit determination in 1998 because **by then** it was **already** clear to her that the Plan administrators would have denied her claim]," Def. Mem. at 17 (emphases added).  FAC ¶ 21 says Plaintiffs know this now, aided by counsel, not that they knew this then.[13]

**II.**    **The discovery rule, not the injury occurrence rule, is the governing test as to when Ms. Alvarez's claim accrued.  Under that test, her claim is not time-barred because she had no reason to suspect at the time she was underpaid that in fact she had been underpaid.**

As noted above, "[a] federal court generally employs the 'discovery rule,' under which 'a plaintiff's cause of action accrues when he discovers, or with due diligence *should* have discovered, the injury that is the basis of the litigation.'  *Guilbert,* 480 F.3d at 149 (citation omitted) (emphasis added).  The rule delays triggering the statute of limitations "where plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted." *Thompson v. Metropolitan Life Ins. Co.,* 149 F.Supp.2d 38, 48 (S.D.N.Y. 2001), *citing Kronisch v. United States,* 150 F.3d 112, 121 (2d Cir. 1998).  Under this rule, "accrual may be postponed until the plaintiff has or with reasonable diligence should have discovered the critical

---

[13] Equally absurd is Skadden's argument that Ms. Alvarez makes a "binding admission" that the payment the Plan made to her in 1998 was a "clear repudiation of benefits" because she alleges that it is futile for her to pursue the Plan's internal claims process. Def. Mem. at 17.  A showing of futility need not and here does not implicate what the participant knew or should have known about her injury at the time it was inflicted.  The Complaint's assertion that pursuing an internal claim in 2007 is pointless says nothing about what Plaintiffs knew when they received their underpayments.  Additionally, Skadden is also wrong to suggest that alleging futility is the sole way a plaintiff can legitimately avoid the claims process.  *Id.* Numerous cases establish, as Plaintiffs allege, that a plaintiff is not required to exhaust the plan's internal claims process where those claims are premised on establishing ERISA statutory violations.  *See Stolarz v. Rosen***,** 2005 WL 2124545, *4 (S.D.N.Y. Aug. 25, 2006) (permitting statutory claims for benefits without requiring exhaustion; collecting cases).

facts of both his injury and its cause." *Id., citing Corcoran v. New York Power Auth.,* 202 F.3d 550, 544 (2d Cir. 1999). The test is not what the plaintiff *could* have discovered but what the plaintiff *should* have discovered. *Id.* at 52 n.12.[14]

Not surprisingly given ERISA's broadly protective purposes, every Court of Appeals to decide the question, including the Second Circuit, has held the discovery rule applies to ERISA benefit claims. *See Guilbert,* 480 F.3d at 149; *Carey,* 201 F.3d at 48-49. The rule ensures a benefits claimant the opportunity to learn that she has been injured and may have a possible claim before her claim will be deemed to have accrued. It reflects the courts' often-expressed concerns about imposing a burden on average plan participants to investigate and discover possible errors or abuses without fair notice, leaving the onus on the fiduciary to clearly make known to the beneficiary that it is repudiating plaintiff's claim (or potential claim) for benefits.[15]

Accordingly, in cases not involving a complete **denial** of benefits, such as here where a payment has been made, virtually all courts deciding the issue recognize that a payment that is an

---

[14] The discovery rule developed as an exception to the injury occurrence rule for cases in which "the injury [was] not of the sort that [could] readily be discovered when it occur[red]." *Connors v. Hallmark & Sun Coal Co.,* 935 F.2d 336, 342 (D.C. Cir. 1991) (R.B. Ginsburg, J.); *see also id.* at 343 (where the injury was "likely to be a hidden injury"). As explained by Judge Posner, the injury occurrence rule can be considered analytically as a particular instance of the discovery rule (rather than the discovery rule an exception to the injury occurrence rule): if the injury is such that it should reasonably be discovered at the time it occurs, then the plaintiff should be charged with discovery of the injury, and the limitations period should commence, at that time. But if, on the other hand, the injury is not of the sort that can readily be discovered when it occurs, then the action will accrue, and the limitations period commence, only when the plaintiff has discovered, or with due diligence should have discovered, the injury. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990) ("Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs**,** but the date - often the same*,* but sometimes later - on which the plaintiff discovers that he has been injured.") (emphasis added).

[15] *Devito v. Pension Plan of Local 819 I.B.T. Pension Fund,* 975 F. Supp. 258, 265 (S.D.N.Y. 1997) (rejecting accrual rule in ERISA "backloading" case that "would have the undesirable effect of requiring plan participants and beneficiaries 'likely unfamiliar with the intricacies of pension plan formulas and the technical requirements of ERISA, to become watchdogs over potential [p]lan errors and abuses'") (citation omitted). *Cf. Rotella,* 528 U.S. at 555 (limitations for medical malpractice not generally triggered by the malpractice but by the discovery of same; otherwise, patients would be expected to assume the doctor they have trusted to treat them would not only mistreat them but then conceal such mistreatment if it occurred).

underpayment does not, absent some special knowledge on the participant's part or something facially incorrect with the payment, give a participant adequate notice that she has been injured. *E.g., Novella v. West. Cnty, N.Y. Carpenters' Pens. Fund*, 443 F.Supp.2d 540, 544-45 (S.D.N.Y. 2006) (Mukasey, C.J.).[16]

As noted above, there are obviously instances where the payment itself, even though unaccompanied by an explicit denial of the benefit the plaintiff subsequently sues on, is enough to trigger the limitations clock. A good example is the case of the disability claimant discussed in *Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516 (3d Cir. 2007), a case Skadden cites but which proves Plaintiff's point not Skadden's because *Miller* arrives at the right result using the discovery rule not Defendant's rule.

In *Miller,* the plan made an obvious mistake that was staring Miller in the face month-after-month for 15 years before he first claimed to have realized it: namely, the plan was systematically underpaying him because it had not used Miller's most recent salary to calculate his 60%-of-pay monthly disability payment. Unfortunately for Miller, a little simple math would have told him that the plan goofed – simple math he never bothered to perform. 475 F.3d at 522-23 (error "should have been clear to him upon initial receipt of payment in 1987-monthly checks based on a simple calculation"; "his receipt of benefits [should have] alerted him that his award had been miscalculated").[17]

---

[16] *Accord Miele v. Pension Plan of N.Y.S. Teamsters Conf. Pension and Ret. Fund.* 72 F. Supp. 2d 88, 99 (E.D.N.Y. 1999); *Esden v. Bank of Boston*, 182 F.R.D. 432, 437 (D. Vt. 1998), *rev'd on other grounds,* 229 F.3d 154 (2d Cir. 2000); *Kiefer v. Ceridian Corp.,* 976 F.Supp. 829, 842-43 (D.Minn.1997). *See also Cotter v. Eastern Conf. of Teamsters Ret. Plan*, 898 F.2d 424, 428 (4th Cir. 1990). Skadden ignores all of these cases except for *Novella* which it effectively ignores by purporting to distinguish it in a glancing footnote that says little more than *Novella* is inapplicable to this case because Ms. Alvarez has already admitted that she has known since 1998 that she was underpaid. Def. Mem. at 17 n.12.

[17] *Hebert v. AAI UIC Retirement Plan,* 2006 WL 1996855 (D. Md.), also cited by Skadden, is to the same effect. In *Hebert,* the plaintiff acknowledged that he assumed from day one that the check received had not been correctly calculated, yet did nothing about it for 8 years. *Id.* at *1-2 & n.9.

By contrast, here, the Plan turned over to Ms. Alvarez every penny of what was in her "bank account" – it would have been *unreasonable,* based on what she had been assured, to give the matter any further thought once she checked and confirmed that the Plan's representation was correct (as it was).  Given that the Plan had consistently represented to her that her benefit equaled her account balance she can hardly be faulted for not becoming suspicious when the check she received equaled her last account statement.[18]

As noted, there was and is nothing unusual or inherently illegal about a cash balance plan calculating lump sums in that fashion, as IRS Notice 96-8 makes clear.  *See also Fink v. Nat'l Savings and Trust Co.,* 772 F.2d 951, 957 (D.C. Cir.1985) (holding in fiduciary breach case that "[t]he disclosure of a transaction that is not inherently a statutory breach of fiduciary duty cannot communicate the existence of the underlying breach").  Yet Defendant still suggests that a "clear repudiation" "should be known" to a participant like Ms. Alvarez when she receives payment even when she is not explicitly told anything is being denied.  Def. Mem. at 18-19.  Defendant's reasoning is not made explicit – it makes its point almost entirely through quoting an edited passage from *Laurenzano v. Blue Cross and Blue Shield of Mass.,* 134 F.Supp.2d 189 (D. Mass. 2001), which wrongly decided the issue in *dicta* without the benefit of briefing.  Defendant's reasoning is as follows:  by tendering a payment to Ms. Alvarez that omitted the portion of her benefit at issue here (that she only *now* understands was improperly withheld), the Plan implicitly, yet sufficiently "clear[ly]," "repudiated" any additional claim for payment that she

---

[18] *See, e.g., Central States v. Groesbeck Lumber & Supply, Inc*., 2000 WL 1670956, * 3 (N.D. Ill. 2000) (denying employer summary judgment in ERISA delinquent contributions case, finding defendant "has no basis to claim that the Fund should have known of the [Groesbeck's] default prior to that date. In its periodic filings with the Fund, Groesbeck certified that its representations regarding the employees for whom contributions were owed were true and correct. Groesbeck offers nothing to suggest that anything was brought to the Fund's attention that should have clued it in that these representations were wrong, and no authority for the proposition that the Fund should have disbelieved Groesbeck and checked for itself. In sum, there is no evidence from which a reasonable fact finder could find in Groesbeck's favor on its statute of limitations defense").

might make.  Put another way, because Ms. Alvarez knew she was paid **x** and that she was not paid something <u>more</u> than **x** that her claim to be paid something more than **x** was clearly repudiated when she only received **x**, making it appropriate to date the accrual of her claim that she was underpaid from the date she received the underpayment *whether she actually realized or should have realized it as such*.

This, however, is just the injury occurrence rule with the label "clear repudiation - discovery rule" slapped on.[19]  It effectively transforms the discovery rule into the injury occurrence test by holding a participant strictly liable for understanding simply from the fact of an occurrence (the underpayment) that she was indeed injured even if that occurrence was not one she can reasonably be blamed for not seeing as an injury or a basis for a claim.  Congress cannot have intended to absolve from liability a plan that breached the statute's minimum standards and deprived participants of any reasonable opportunity to become aware of that fact.[20]

---

[19] Or, put another way, even assuming one can find the plan "repudiates" **x** when it pays the participant **y,** there can be no "clear" repudiation of **x** sufficient to trigger the statute of limitations where the plan has never told the participant she might conceivably be entitled to **x** and where **x** is never even identified.  *See Esden,* 182 F.R.D. at 437 (letter from plan stating generally that plaintiff was not entitled to additional benefits was not a clear repudiation; that only occurred five years later, when defendant rejected plaintiff's specific claim for an additional, whipsaw payment).

[20] *See Varity Corp. v. Howe,* 516 U.S. 489, 513 (1996) (holding that ERISA's stated objective of providing "'ready access to the Federal courts'" disfavors interpretation of statute that would strip beneficiaries of ability to file suit) (*quoting* ERISA § 2(b), 29 U.S.C. § 1001(b)).  Of course, the "clear repudiation" language derives from trust law.  *Miles,* 698 F.2d at 598.  Under trust law, beneficiaries of a trust are permitted to rely on the good faith and expertise of their trustees; because of this reliance, beneficiaries are under a lesser duty to discover malfeasance by their trustees and the standard for deeming the beneficiary's cause of action to accrue is especially high.  *E.g., Shoshone Indian Tribe of Wind River Reservation v. U.S.,* 364 F.3d 1339, 1348 (Fed. Cir. 2005); Bogert, *The Law Of Trusts And Trustees* § 951 (2007).   Following ERISA's enactment, to help resolve limitations questions, courts turned to the language and concepts of trust law based on their understanding that Congress intended participants, often dependent on their fiduciaries to learn of their claims, not to lose their rights before having a reasonable chance to assert them.  It would be anomalous indeed if semantic misuse of the term "repudiation" results in ERISA participants losing the benefit of an accrual rule (the discovery rule) available to other federal plaintiffs suing defendants who did not owe them any fiduciary duty.  *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113-14 (1989) (courts are to avoid interpretations of ERISA "that would afford less protection to employees . . . than they enjoyed before ERISA was enacted").

The text of *Carey* alone precludes the alteration of the governing standard which Skadden seeks to accomplish. In discussing Mr. Carey's argument on appeal advocating strict adherence to the traditional rule that no claim for benefits can accrue absent a formal denial by the plan, the Court of Appeals observed that because typically such denials can only occur after a participant retires, many claims that are otherwise resolvable one way or another might sit unresolved for years. In explaining why it opted not to adhere the formal denial requirement, the Court of Appeals said:

> To be sure, requiring an ERISA plaintiff to file suit upon a plan's clear repudiation even in the absence of a formal application may, in some instances, result in piecemeal litigation, or litigation of claims that the plan might otherwise have resolved internally. In addition, an ERISA plaintiff may very well be reluctant to sue his plan while he is still a member of the associated union. But these concerns are not substantial enough to warrant a departure from the general rule that **a plaintiff's claim accrues when he discovers, or with reasonable diligence should discover, the *injury* that gives rise to his claim**.

*Id.* at 48 (emphasis added).

Because Defendant does not argue and cannot establish that in 1998 or prior to August 20, 2001, Ms. Alvarez should have realized she had been underpaid, *i.e.,* injured, Skadden's partial motion to dismiss should be denied.[21]

## III.    Even if her claim accrued, Ms. Alvarez's action is timely.

Even assuming Ms. Alvarez's claim accrued more than 6 years prior to the initiation of this action, it is still timely because of equitable tolling and/or because Skadden is equitably estopped from interposing a limitations defense.

---

[21] Skadden does not carry its burden to show Ms. Alvarez's claim accrued more than 6 years before the commencement of this action saying that the Court must find it accrued then because otherwise the statute of limitations would have no "meaning" in this case. Def. Mem. at 19. If the statute of limitations does not in this case have the meaning **that Skadden wants it to have**, it has only itself to blame. Nothing in law or policy requires a defendant to have a "meaning[ful]" limitations defense: limitations is an affirmative defense subject to the doctrines of waiver, estoppel, and equitable tolling. Skadden again misreads *Carey* as supporting its position when in fact the aspect of the decision Skadden invokes involved something entirely different, namely not permitting a form-over-substance use of the formal claims process, well after the plaintiff knows his claim has been denied, to revive a stale claim but using it to obtain a fresh denial. 201 F.3d at 49. There is nothing like that going on here.

Equitable estoppel and equitable tolling are similar but distinct doctrines. Perhaps the best description of the distinction comes from Judge Posner's opinion in *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990). There he explained that equitable estoppel, which has also been referred to as fraudulent concealment, "comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations," and that equitable tolling "permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Cada*, 920 F.2d at 451. Here, the undisputed (or indisputable) facts show that Ms. Alvarez is entitled to the application of either or both doctrines, or at least the opportunity to conduct discovery to support her contentions should the Court need to render a ruling on their applicability here.

### A.    The elements of equitable estoppel are satisfied here.

Under the doctrine of equitable estoppel, a defendant may not assert a statute of limitations defense where the plaintiff was "induced to refrain from commencing [a timely] action" by the defendant's "active concealment" of its wrongdoing. *Niagara Mohawk Power Corp. v. Freed*, 696 N.Y.S.2d 600, 603 (N.Y. App. Div. 1999). [22] The doctrine rests on the deeply-rooted principle "that a wrongdoer should not be able to take refuge behind the shield of his own wrong." *General Stencils, Inc. v. Chiappa,* 219 N.E.2d 169, 170 (N.Y. 1966).

"The elements of estoppel are with respect to the party estopped:  (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct

---

[22] Federal courts following state statutes of limitations look to state tolling provisions, *Chardon v. Soto,* 462 U.S. 650, 660 (1983), so New York law, which recognizes the doctrine of equitable estoppel, governs here. *E.g., Keating v. Carey*, 706 F.2d 377, 382 (2d Cir. 1983) (looking to New York law to find in that § 1983 action that the plaintiff had established a genuine issue of material fact as to whether the defendants were equitably estopped from raising a limitations defense against him).

will be acted upon by the other party; and (3) knowledge of the real facts." *Airco Alloys Div.,*

*Airco Inc. v. Niagra Mohawk Power Corp.,* 430 N.Y.S.2d 179, 187 (1980).

These elements are firmly established here. The record establishes that Defendant lulled

Ms. Alvarez into not filing suit sooner through its conscious concealment of its systematic

underpayment practice and the fact that there was another way in which her lump sum could have

been calculated (indeed, *had* to be calculated). *See Laurent v. PwC,* 448 F.Supp.2d at 547

(holding cash balance plan SPD invalid where it failed to disclose sponsor's use of an illegal

normal retirement age designed to evade the whipsaw rule; failure to disclose the illegality

"prevented [Plaintiffs] from immediately 'seeking injunctive relief'" to bring the plan into

compliance with the law) (citation omitted). So too Defendant's active concealment of some of

the Plan's most elemental features was also clearly intended to keep participants like Ms. Alvarez

in the dark to induce their inaction:

- Why else would Skadden, through the Firm or the partner administrative committee, fail to disclose the nature and content of the minimum interest crediting rate guarantee? The guarantee was an extremely valuable feature of the Plan which most employers would be touting and patting themselves on the back for providing.

- Why else would Skadden bury the very fact of the Plan's guaranteed minimum interest credit existence at the tail-end of highly technical footnote that few if any participants would ever get through?

- Why else would Skadden, when disclosing in that same footnote the existence of the minimum guarantee, say literally nothing about it except that is determined by a formula contained in the Plan document, another highly technical writing which is not even made available to participants unless they ask for a copy in writing?

- Why else would Skadden disclose to participants that that *year's* interest rate was 8% but not tie the guarantee and that rate together for participants so they understand how that rate came about? Why else would Skadden make it sound like the rate just happened to be 8% in that particular year, as if it were a result of market forces or an *ad hoc* decision by the Firm, when it was the result of an embedded Plan feature that participants had every right to know about?

- Why else, after the Second Circuit decided *Esden,* eliminate any reference whatsoever to the very existence of the guarantee?

On this record, the Court can and should find Skadden equitably estopped from interposing a limitations defense at all.  At a minimum, Ms. Alvarez should be permitted the opportunity to conduct discovery to support this contention before being deemed time-barred. *E.g., Candelaria v. Erickson,* 2005 WL 1529566, *10 (S.D.N.Y., June 28, 2005) (denying motion to dismiss, finding plaintiff's allegations and evidentiary proffers sufficient to suggest that medical staff may have acted to induce plaintiff to refrain from suing or otherwise challenging their alleged malpractice).

> **B.      The elements of equitable tolling are satisfied here.**

The doctrine of equitable tolling also applies here, for many of the same reasons equitable estoppel does.

"The essence of the doctrine [of equitable tolling] is that a statute of limitations does not run against a plaintiff who is unaware of his cause of action."  *Cerbone v. Int'l Ladies Garment Workers' Union,* 768 F.2d 45, 48 (2d Cir. 1985).  In order to prevail on an equitable tolling theory, a plaintiff must show that she was not aware of her claim either because the nature of the defendant's conduct was "self-concealing" or because the defendant affirmatively acted to prevent plaintiff from discovering the conduct.  *Id.*  Plaintiff must also show that the concealment prevented their discovery of the claims within the limitations period and that they exercised due diligence in investigating their rights.  *Id.*; *State of New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1083 (2d Cir. 1988).

These elements are satisfied here.  Ms. Alvarez was unaware of her cause of action because Skadden made sure she would be.  She diligently confirmed her award but, lacking the basic information about how the Plan's critically important crediting rate provisions really worked, she was prevented from having any reasonable opportunity to discover her injury.

In *City of New York v. Heckler*, 742 F.2d 729 (2d Cir. 1984), a case with striking parallels to this one, the Second Circuit held that disability claimants who had been subjected to an unlawful presumption concerning residual functional capacity were not time-barred for failing to earlier challenge denials of their claims under the doctrine of equitable tolling because the government had kept the challenged presumption secret from them.  The Court of Appeals explained:

> All of the class members who permitted their administrative or judicial remedies to expire were entitled to believe that their Government's determination of ineligibility was the considered judgment of an agency faithfully executing the laws of the United States. Though they knew of the denial or loss of benefits, they did not and could not know that those adverse decisions had been made on the basis of a systematic procedural irregularity that rendered them subject to court challenge.   Where the Government's secretive conduct prevents plaintiffs from knowing of a violation of rights, statutes of limitations have been tolled until such time as plaintiffs had a reasonable opportunity to learn the facts concerning the cause of action.   Since in this case the full extent of the Government's clandestine policy was uncovered only in the course of this litigation, all class members may pursue this action notwithstanding the 60-day requirement.

*Id.* at 738.  The Supreme Court affirmed, explicitly endorsing the Court of Appeals' reasoning. *Bowen v. City of New York,* 476 U.S. 467, 480-82 (1986).

Here, assuming one can impute to Ms. Alvarez the knowledge that she was been denied a benefit of which she had never been made aware might be hers, as in *Bowen,* she had no way of knowing that she had been denied such benefit improperly, due to a "clandestine" "systemic procedural irregularity."  The doctrine of equitable tolling should be available to someone in her position, like it was in *Heckler/Bowen,* where the defendant, a fiduciary no less, furtively concealed the gravamen of her claim.

**Conclusion**

Wherefore, for these and such other reasons as may appear to the Court, Plaintiffs respectfully request that Defendants' motion be denied.[23]


Dated:  December 10, 2007          Respectfully submitted:


                                        /Eli Gottesdiener
                                   Eli Gottesdiener [EG0111]
                                   Gottesdiener Law Firm, PLLC
                                   498 7th Street
                                   Brooklyn, N.Y. 11215
                                   (718) 788-1500
                                   (718) 788-1650 (facsimile)

                                   *Attorney for Plaintiffs and the proposed Classes*

---

[23] Plaintiffs do not and could not within page limitations respond to all of the factually and legally incorrect assertions in Defendant's submission.  Plaintiffs would be happy to answer any questions the Court may have at an oral argument or in a targeted supplemental filing if the Court might find that helpful.